Judge Bauer and I are pleased to welcome this morning to the bench the Honorable James Peterson, United States District Judge for the Western District of Wisconsin, who has volunteered or been drafted to assist us in our work with today's cases. First case for the day is number 151827 Midwest Fence Corporation against the United States Department of Justice. Good morning, Your Honors. It's James DeShiel on behalf of the Plaintiff Appellant Midwest Fence Corporation. The case is before the court on appeal from a summary judgment entered in the district court upon cross motions of all parties. The judgment was in favor of the defendants and against my client, Midwest Fence. Before proceeding, I would like to thank the court for the opportunity to be here and to be heard this morning. There's obviously a great deal to cover, so I will be guided by comments and questions from the court on those items that will be emphasized. I was going to begin and will begin with standing. Obviously, critical preliminary matter. IDOT defendants were the ones to raise standing on appeal, and they claimed that the recent case out of this court from Nantunut Bay would be controlling. But this case is much different than Nantunut Bay for a couple of very critical reasons. The first is that Nantunut Bay, being a large general contractor, did not compete directly with DBEs. But Midwest Fence, while its owners may have a net worth precluding them from being certified as DBEs, in fact, as a company, is small enough that it does compete with DBEs all the time. It serves usually as a subcontractor on the public projects, and its expertise is limited to guardrail and fencing. And as I've noted in the briefs, obviously, to be a large general contractor, one needs a great deal of skill and expertise beyond one or two line items like Midwest Fence or, I might add, typical DBEs. Nantunut Bay was such a contractor, that case involved only one large general contract, and this court noted that Nantunut Bay did not, in fact, compete with any DBEs for that job and was treated the same as other general contractors competing for it. Wasn't the principal problem in Nantunut Bay that the contract was re-let? That was the second point. I apologize, I don't know if that's for sure. That was the second point, and that is that in terms of redressability, I did, yes, Your Honor, re-let the contract, and as a consequence, any harm that may have been done to Nantunut Bay was redressed independently by the action of the state. But was it also part of the reasoning in Nantunut Bay that the contractor in Nantunut Bay, like Midwest Fence, would not itself qualify as a DBE so that the burden was not because of the race of its owners? And that part of the rationale of Nantunut Bay does seem to apply here because there's the stipulation that parties entered that it's not because of race, I guess, is the standing issue, the part of the standing issue in Nantunut Bay that doesn't seem to be addressed by the points that you raised. Okay, a couple of points to answer the court's question. First, we have to keep in mind there are two ways in which one might say they're being discriminated against. Two steps. The first step would be certification. But the second step is the one that really counts. I mean, so a person's not certified as a DBE, well, so what? So what means they're not going to be able to compete freely and fairly against the DBEs. Well, that's precisely the situation we have here. And the test for standing has been set forth clearly by the Supreme Court in the Northeastern Florida case. It's Northeastern Florida chapter, the AGC, others refer to it as Northeastern Florida. The court did say that it is the inability to compete or having barriers thrown in one's path for competition that gives one standing. And in fact, the court said it's not even necessary to lose a contract. So the really key step here in terms of what constitutes discrimination, Your Honor, would be the inability to compete on equal footing with DBEs. And in fact, Midwest Fence has lost millions of dollars to DBEs. In fact, discovery was still open in the lower carpet we put in, evidence of that which we stand by. Address, if you would, the standing to challenge the TMP. Yes, Your Honor, thank you. That, of course, is a separate issue entirely. And as the court knows and as I've candidly admitted, the cases we have relied upon are cases of mootness. In our research, we did not find another case exactly like this, which I recognize, and defendants quickly called that to our attention as well. However, it is our position that the same principles of law and equity apply. Has the target market program actually been applied to contracts your client has bid upon? No, and a couple of clarifications on that, Your Honor. We can't bid on something that's been selected for the target market because only a minority-owned and women-owned businesses are permitted to bid on those. Now, I should talk about the target market program. It exists in two districts, and it involves set-asides of selected line items for minority-owned and women-owned firms. And yes, Your Honor, it is true the state has carefully avoided selecting guardrail and fencing as such an item. They have, however, given us no reason why they might not in the future, and I'm not aware of any evidence why they might not. Well, your mootness cases all start from the proposition that the defendant has already done something bad to the plaintiff, right? No, they start from the proposition that we have a program in place which we assert is unconstitutional on its face because it's an unconstitutional set-aside and quotas, and that can turn on us any day, just as in the mootness cases. Now, I should correct myself a bit, Your Honor. Technically, the court is right because we obviously are asserting we have standing for the reasons that I've just given, so the target market program can be viewed as kind of an appendage of the other program. But those would be our grounds for standing. And I see no reason why the court cannot simply ask the same jurisdictional questions of the state as they would in a mootness case. You know, is there a reason you're not selecting guardrail and fencing? Do you have a sound reason, or it's only pretextual? And what is the evidence you have or the reasons you can give us as to why you're not going to be selecting guardrail and fencing in the future? I see the court looking at me, so you may have some further questions on that. Go ahead. But that is our position on target market. I'm standing. Before I move on, I'll invite any questions the court may have. I trust you will answer me as needed before it comes up. We have a pending motion before the court, but since that was actually brought by the defendants, it had been my plan to let the defendants bring the motion. Let me ask one question about that. I took a look at the new report. It's a big document, but it seems largely to recapitulate a lot of assertions that were made in the reports that are before the court. And so I guess my point of question to you on that, it is their motion, but my question to you is what's in the new report that you need in your case here? What's new in that? I'm not sure I'd say I'd need it, Your Honor, but I think it would be helpful to the court. What would you like? In corroboration. Point us to the thing that matters. A couple of things, one in particular. What they have are a couple of tables, which are attached actually to the motions, so they would be before the court. And what those tables show are what they call the disparity index. And if you have an index of 100%, you have perfect utopian situation of complete utilization in accordance with availability. Below 80% starts raising eyebrows, and people might look to see if there's any discrimination going on. But what this table shows is that Hispanic Americans are utilized 213% disparity index, which means that they are overutilized really more than double what they should be, whereas African Americans, and I can't remember the exact percentage, Your Honor, it was a very small percentage. Asians as well were overutilized over 100%. Well, let me ask you just on the record question, wasn't that information also in earlier reports? I mean, that information is available to the court through Holt's testimony. Wasn't that overutilization, the alleged overutilization available in the 2006? I did not recall that coming from Ms. Holt's testimony, Your Honor, and the Tollways told us presumably this was not available until they published it. Okay, so that's the nub of what you want from the new report. That is the primary thing. Let me ask you if I could about that. You've emphasized in your briefs how flexible affirmative action programs like this have to be to stay constitutional, right? You know, both defendants and we have, flexibility is being used in different senses by each of us. The answer is yes. It's important, right? Yes, yes. And state officials like the ones administering these programs presumably have to stay attuned to developments and changes in the market, correct? Absolutely, Your Honor. Okay, so new information comes along. How quickly are they obliged to digest that information and act upon it? Well, in this case, it would be a very simple matter to state, which, incidentally, the prior study done for the Tollway recommended but was rejected by the Tollway. We can talk about that later. It would be a very simple thing for the state to decide that for the contract goals of DB participation, that would be limited to women-owned and African-American-owned firms. My point, Mr. DeShiel, is that all of this is new information that was not available to the district court. One would expect in the monitoring and continual fine-tuning of these sorts of programs to constantly get new information and need to be adjusting it all the time. So why do you need this on appeal? Why is it fair to the defendants to use it on appeal? A couple of reasons. First question, why do we need it on appeal? Remember, they're reviewing data, past data. So that past data was, well, always going to be the case. And that's, well, we have been competing and we have suffered damages. We should be aware of that, and so should the court. And secondly, we're also seeking prospective injunctive relief. And the court should be aware that there's, and be prepared to order if necessary, that appropriate adjustments be made for this data. And as I mentioned to the court, it would be quite simple. That's not necessarily always the case. In this case, it's a very simple matter for the TOI to adjust its program to accommodate this new data. So I hope that answered the court's question. And with respect to the motion, Your Honor, since we were talking about it, the other point that I think is relevant in the data, and we cited it, what Ms. Holt and her company did was to perform a survey of general contractors regarding the total amount of subcontracting that they did in terms of dollars. So that means they have that data, at least they have some kind of estimate of that data, of your total subcontracting dollars. Now, that means it would not just include DBEs, but it would include the non-DBE subcontractors so that we would have some kind of metric or quantity that we could look to to determine the burden on the innocent third parties who bear the brunt of the burden, namely your smaller non-DBE contractors, subcontractors, in other words. They have the data, but they don't tell us what it is anywhere in the report. That would be the other aspect of this new report that I find very, very telling and important to the court. And that would give your data a remember of what's been happening in the past, and there's no good reason why they shouldn't have been tracking this data all along. That would be my second reason, Your Honor. Moving on to the merits of the case, there's an overarching constitutional question which really needs to be addressed at the outset. And Midwest Fence has proceeded from the promise, and I'm very serious, that the Constitution is the supreme law of the land over any federal statute or any set of federal regulations or any federal statutory regulatory scheme, period. Now, I start from that promise, and I mention it because if anyone does disagree, I'd like to address it now. Otherwise, I'll be moving on to discuss northern contracting and the limits of that case and some dangerous over-reading that's been done by the state. Mr. Shield, I'd like to ask you actually to kind of skip over that issue a little bit and focus. Let's assume that there is a substantial basis for a need for some DBE program for the tollway in the Department of Transportation. I know that you dispute that, but let's assume that there is some. I understand your argument to be that there is an unfair mismatch between the remedies adopted and the problem because the burden is put on people, on businesses like your client, right? That's correct. Okay. I guess part of my concern, that argument seems to assume that prime contracting and subcontracting are entirely different markets near the twain shall meet. And I'm wondering how valid that assumption is. I thought your client did some prime bidding. Some of the people that are normally prime bidders also do some subcontracting bidding. How sharp are the differences and what does the record tell us about that? That's a very important question. They're not absolute differences. The court is correct. But it is to the point where it's a difference that simply cannot be denied. Now, one way to look at it easily is by the uniform reports, which IDOT sends twice a year, and it also updates those, to the Federal Highway Administration as they're required to do under the regulations. Now, what those reports will do is show us the percentage of prime contract dollars. By that, I mean money that not only goes to prime contractors but stays with the prime contractor. It shows the percentage of prime contract dollars that go to DBEs. It shows the percentage of dollars DBEs receive each period, how much of that is from prime contracting and how much of that is from subcontracting. And its overwhelming majority comes from subcontracting dollars. So that tells us the story. As the court noted, no, it's not absolute. But you'll note even in the regulations themselves, they talk about something called unbundling. And they characterize properly unbundling as a race-neutral alternative to encourage and help DBEs to bid. By unbundling, what is meant is a large general contract, instead of being let out as a single contract, is broken up into many different contracts so that each of the contracts actually let by IDOT or the tollway. Well, a general contract is small and limited to one or a few types of work so that it can be handled by your smaller contractors and it can be handled by a DBE. My point, even the regulations are acknowledging the difficulty of DBEs to serve as general contractors. And we've had some admissions that IDOT has made us pleading that we have cited in our brief where they have noted DBEs simply cannot perform the large general contractors. We have uncontested testimony from IDOT's own chief engineer, Omar Osman, which we've also cited in the brief, where he explains that DBEs cannot perform large general contracts because it requires such vast amounts of resources and expertise, and DBEs tend to be smaller and specialized, likely to find Midwest fence. So, no, Your Honor, you're right. There are occasions, absolutely, when DBEs can serve as general contractors, but they're limited. They cannot perform the huge types of contracts that are performed and done at bay. And that's why, in terms of dollars, DBEs actually get such a small amount of prime contract dollars and why prime contract dollars are such a small amount of total dollars that go to DBEs. Well, can you direct us to a case law that indicates we need to slice the market up that finely in terms of looking at, you know, your client seems to be in the niche of guardrail and fencing, right? That's their specialty. It's not all they do, but that's their big thing, right? That's what they do. Okay, that's what they do. But, you know, we've got evidence in front of us showing pretty broad patterns of discrimination in highway construction generally. We've got the zero goal experiments that both IDOT and the tollway did. If you want to tell me about those, I'd be interested in that. But given the fairly broad evidence of discrimination in the absence of these programs, why does the program have to be as finely tuned as you're arguing and what case law tells us that? Well, you've asked a couple of questions. Why does it have to be as finely tuned? Because subcontractors receive only much less than half of the total dollars, yet they're being asked to bear the burden of DBEs sharing, and all this money that goes and stays with general contractors, in fact, DBEs cannot receive. So that's the first question. Why is this so important? Where is the case law? Very good question. I'm going to go all the way back to Crowson to give you the case law, and I'm going to jump ahead to make a comment. I have scratched my head often as to what has happened in some of the lower court cases, and you'll notice I have a little bit of gray hair, only a little bit left. You're lucky. And I earned it all, believe me. It goes back to litigation 101. I know your honors have seen the same thing, and I've tried so many cases, where I see these lawyers absolutely brilliant in their area, and complete command of the facts and the law, and I look there and start arguing and briefing and presenting a case as if it was obvious to everybody else, and it's not. What we have here, I think, is complicated industry. It can vary from state to state. You know, the self-performance requirements, for example, of Illinois, I'm not sure how many other states have those. That can change things considerably. They just frankly blew it and didn't tell the courts about it. Go ahead. It's a caution. You're into your rebuttal time. Thank you very much, Your Honor. I appreciate that. The overarching issue of the Constitution I had mentioned, I didn't hear anyone disagree with the premise, and Northern Contracting should be read very carefully, because, of course, in that case, a challenge to the federal regulations had been forfeited. There had been the earlier summary judgment for the United States defendants. Since that was never appealed, well, the law of the case before this court was that the regulations were constitutionally valid, and all of its holdings and reasoning emanate from that. The way it's been interpreted by the state is all they ever have to do is just follow the regulations, which means the regulations in practice in Illinois for the past eight years have been trumping the Constitution, which I find as an officer of the court very scary. There are numerous very important, such as the mismatch issues, which arise once we imply the constitutional standards of narrow tailoring. One last question. I understand the general argument that you're making is that the burden of meeting the DBE goal falls disproportionately to the subcontractors rather than the prime contractors or rather contractors generally. Is it your contention that guardrail and fencing is one of the subcontracting areas that has become kind of the go-to line item for DBE participation as opposed to other subcontractor line items? Yes. The reason for that, Your Honor, is because guardrail and fencing with the steel that's involved for the guardrails, there's more dollars typically to that. So the general contractors can meet their DBE goals by going with the larger subcontractable items, and guardrail and fencing tends to be one of them. Thank you. Thank you, Your Honor. Thank you. All right. For the defendants, the argument is divided. We'll hear first for the U.S. Department of Transportation. May it please the court, Robert Koch on behalf of the United States. I'm here to discuss the facial constitutionality of the federal contracting program for DBEs. This court should affirm the well-reasoned opinion of the district court and should join the 8th, 9th, and 10th circuits in upholding the facial constitutionality of that federal program. The federal program, Your Honors, has all the hallmarks of a narrowly tailored program with respect to the use of race-conscious measures. Race-conscious measures can only be used under the program if race-neutral measures prove insufficient. DBEs can and do compete as prime contractors under the regulations, Your Honors, and if they win contracts where race is not taken into account, that counts towards a state's overall goal. Mr. Koch, I understand your point about facial constitutionality. Do you think because those regulations are so flexible, do you think it's possible for a state to apply them in such a way as to violate the constitutional standards? We don't believe so, Your Honor. Why not? Well, because, Your Honors, the regulations provide a framework that requires the states to, if the states are complying with the regulations, then they're meeting their constitutional requirements. Well, suppose waivers aren't. They're available on paper but not in reality. Or suppose a state winds up calculating exaggerated targets for DBEs. Well, Your Honors, with respect to the question of waivers, if there were an issue with states being unable to get waivers under the federal program, then that would be an instance where somebody could raise an as-applied challenge against the United States DOT. I'm talking about a state making waivers with individual contracts unavailable as a practical matter. Oh, the good faith efforts portion, Your Honor. I'm sorry. Well, Your Honors, then they would not be complying with the, they would be violating the regulations if they were not actually providing good faith efforts considerations under the regulations. And we don't actually consider them a waiver. They are a means under the regulations by which individual contractors can satisfy the regulatory requirements. And if there were an instance where a state had, a state was not granting any good faith efforts considerations whatsoever, then they would, in fact, be violating the regulations. So I take it you don't disagree with counsel for plaintiffs that the Constitution trumps. You're just saying it's congruent with the flexible regulations. That's correct, Your Honor. Let me ask a question about the size limitations on DBEs. Is that set within the federal program or is that left to the state to determine based on its local conditions how big you can be and still be a DBE? Those are a federal requirement, Your Honor. And with respect to, and that applies regardless of the race of the potential DBE. The regulations as part of their efforts to minimize the burden on non-minorities under the program, there are both minorities and non-minorities may participate in the program if they can demonstrate social and economic disadvantage. And in fact, in the history of the program nationally, there have been white male firms that have qualified as DBEs. And again, as long as they fall within the economic limits on their personal wealth of the owners and the side of the revenue of the business. That's correct, Your Honor. And is that indexed to inflation somehow out of the government sector? I believe so, Your Honor. The regulations are periodically updated and they do take into account the inflation. And two questions then. Doesn't the size limit on the DBE tend to limit the participation in DBEs in prime contracting? It's not impossible for them to be a prime contractor, but because there's a size limit on them, prime contracts that require a larger company are not likely to be ones that DBE can successfully pitch for. That's true, Your Honor. Yes. But we believe that actually goes to the narrow tailoring of the program because it limits the use of race, of race conscious individual contract goals with respect to subcontractors to those firms that are most socially and economically disadvantaged. So it's an argument for it, but it is true what Midwest Fence contends that it tends to put the DBE participation goal on the subcontracting side. In part by design because you want the smaller businesses to get the benefit of the DBE program. Yes, Your Honor. But it's important to remember that those individual subcontract goals only come into account if race neutral measures prove insufficient. And, in fact, there are six states currently that are operating their individual state programs wholly using race neutral measures. And so only when those race neutral measures prove insufficient can a state take race into account. And so that limits the use of race in the program from a programmatic standpoint. My second question about the non-woman, non-minority participation in the DBE, just by way of example, what are some of the circumstances in which white males have been able to show that they would qualify as disadvantaged within the meaning of the DBE program? A few examples, Your Honor, have been those individuals who are disabled, those who come from Appalachia, and Hasidic Jews. Very good. Thank you. And one of the main points that plaintiff raises goes towards the burden that is placed on DBEs, on non-DBE subcontractors under the program. But it's important to remember that the regulations themselves prohibit overconcentration in a particular line of work. And so if there were an instance where particular non-DBEs were being frozen out of a particular line of work, the state would be required to address that overconcentration. So what do you do to monitor that? Well, states have the discretion to either actively monitor it themselves, which some states do, for example, the state of Georgia. Alternatively, states could respond appropriately when a claim of overconcentration comes in and investigate, based on local data and local market circumstances, whether there is overconcentration. Are there standards for, quote, overconcentration? There are. USDOT has not prescribed a national definition of what overconcentration is, Your Honor, in part to recognize that in each state, local market circumstances are going to be different. We do not believe that this case requires the court to do any sort of line drawing, because under any definition, plaintiff would not qualify. In the years leading up to this litigation, plaintiff outperformed its DBE competitors, all of them except for one. And so that would not raise a claim of overconcentration. In terms of gross receipts? Yes, Your Honor. Could you help us with, or at least help me with this problem of how specialized or narrow the market analysis needs to be in this area? Given fairly broad evidence of discrimination in highway construction industry generally, how tightly focused on particular subspecialties or niches does the analysis have to get? Well, Your Honor, I think that under the regulations, there really is a rather particularized look into the discrimination in each of the subparts of the industry. As part of the state's goal-setting process, at step one in their goal-setting process, they do need to look at what the evidence of discrimination is within the state. And they typically do so with disparity studies that take a focused look at the different firms within the state, their different lines of work and where there might be discrimination. And then when they actually implement the program on an individual contract-by-contract basis, they look at local market circumstances, which include the lines of work that are going to be used on a particular contract, what the DBE availability is on those lines of contracts, including geographical areas where the contract might be implemented. And so under the regulations, we actually believe that there is a very focused look in terms of where the discrimination might be within the state and within the contracting industry. And your honors, I think it's important to emphasize the flexibility that the federal regulations provide to a state in terms of their implementation under the federal program. Waivers are always available to a state should they require them in terms of implementing the program to tailor it to their local market conditions and quotas are strictly prohibited as well under the federal program. I have a question about the burden on non-participants. Midwest Spence here has kind of an overarching theme that it's being asked to shoulder a disproportionate amount of the burden of the DBE program. Does the federal program have any standards for the burden on non-DBE firms? I think the case law that's been cited throughout the briefing is that the burden is supposed to be diffuse and light, but I don't know if there's any kind of operational definition of how diffuse and how light the burden has to be in the context of the federal program. No, your honor, the regulations prohibit an undue burden, and the regulations do not provide any further prescriptive definition to give states the flexibility to determine it based on their local market conditions. The contracting industry within Illinois, Alaska, Florida, they're all going to be different. And so there is the requirement that if there is an undue burden, then the state must address it. But the state is allowed to, is enabled really to make that determination based on local market conditions. And it seems to me that as I look at the program and the concept of over-concentration, that that issue is addressed. Is there anywhere else? I'm sorry. It seems to me that the concept of over-concentration, that the federal program requires the states to monitor and prevent over-concentration, that seems to be the one area in which the burden on non-participants is addressed. I disagree, your honor, because the framework of the program as a whole, those contract goals can only come into play if race-neutral measures prove insufficient. And as I mentioned earlier, there are six states that are implementing wholly race-neutral programs. And then with respect to the use of an individual contract goal, the state must tailor it to local conditions. In addition, as far as DBEs versus non-DBEs, it's important to remember that with respect to the burden placed on non-minorities under this race-conscious program, non-minorities can and do qualify as DBEs under the program. Can I ask you on the standing problem that we have to deal with in this case, do you see any tension between some of our language in the Dunnett Bay opinion and the Supreme Court standard in northeastern Florida? Your honor, the United States does not take a position on that. I'm asking you to comment. I'm afraid I'm not authorized to speak on that matter. Okay. With respect to the separation of powers, I won't press further. Your honors, we reiterate that this court should join the eighth, ninth, and 10 circuits in upholding the facial constitutionality of the federal program. Recognizing that many of the questions in this case concern the state implementation of the program. Unless this panel has any further questions, I'd be happy to yield the remainder of my time to the counsel for identity. One last quick question for me, at least. I know I have seen in the papers here a reference to a rule of thumb about price differences of 5% or so. Is that a federal standard in terms of how much extra the government should be willing to pay for DBE participation? No, your honor. That's the rule of thumb for the state. Okay. Thank you. Thank you, Mr. Koch. For the department of transportation for the state of Illinois. Mr. Jones. Your honor, you'd be happy to know that the tollway does take position on standing. Are you with the tollway? Oh, I thought you called tollway, judge. I see you're next. So that's fine. If you're Mr. Jones, you're next. I have you with the wrong brief. We've got two briefs from the attorney general's office. I understand. I think judge Bauer, he'll attest for me today. Judge, we do take a position. I would like to just say that one of the things that we've seen that was wrong with the district court's application with Dun & Bay is because, as Mr. DeShields starts off by saying, all right, what we've got to determine. Have we suffered an injury in fact? And are we being put on a different level of footing? But what this court says in Dun & Bay is you can only do that by showing a denial of equal treatment that resulted from the imposition of a racial barrier. And that is what has not been done in this case. Mr. DeShields in no way shows by anything that's been done that there has been the imposition of a racial barrier. You take, for instance, the tollway. With the tollway, the only thing he can do is point out that six of the subcontracts that he bid upon went to a DBE. That could have been for a variety of different reasons. Maybe the crime didn't want Mr. DeShields for those. But where Mr. DeShields gets stuck is he must show us the imposition of a racial barrier. I think the second thing that the district court did wrong in this case was there was a misapplication of the standard in the Northeastern case. And you point that the Dun & Bay points that out. For instance, the tollway had maintained below that even if the plaintiff was to establish an injury in fact, that nevertheless he had to address the other two prongs of standard. One, he had to show the causal connection between the injury and the challenged conduct, meaning that the injury was fairly traceable to the challenged conduct. Two, three, he had to show a likelihood that the injury would be redressed by a favorable decision. Now, what the district court did in total contravention of what this court decided in Dun & Bay was district court says, well, look, if I find an injury in fact, then I'm going to collapse the other two standards, meaning that I don't even have to address causation and redressability. And that with the decision in Dun & Bay is absolutely wrong. It was the plaintiff's burden in this case to show all three elements. And Judge Peterson, as you point out, when you asked Mr. DeShield, sir, isn't it true that what really happens here doesn't make any difference that you have to compete against DBs or whether, but isn't the only thing, denial you've shown of equal treatment was because of your size. And that is the only thing that they've done in this particular case. They've not shown the imposition of a racial barrier. And we say they have no standing in this case. You're not suggesting the targets are a race neutral measure, are you? That. The targets for DBE participation are race neutral? The, you mean, the people. The entire DBE program is a race conscious remedy. It is a race conscious remedy. There's no question about that, Judge. And I guess I had understood the Northeastern Florida decision to apply, frankly, a fairly relaxed standard of standing in such cases. But it's the Supreme Court telling us to do so because what they're focused on is competing on a level playing field. And absolutely. But I think what this court did in Dunnett Bay, though, Judge, is said, well, fine. It could even be a, collapsibility could come in if you have the kind of circumstance in Northeastern, which was the plain good old fashioned set aside. That is not true in this case. And that's why in Dunnett Bay they said, no, if you don't have that, then there's no reason why all three should not be considered. I guess the other thing, if there are other questions on that, that I have to cover, Judge, is should the Colette-Holtz study be admitted? And I think that both of your honors asked some very salient points that I'd like to cover quickly. We think that there are four reasons that the Colette-Holtz study should not be admitted. First and primary is it should be excluded because the study was not addressed by the parties of the court in this case. But let's go right second to one that I think that Judge Peterson, that you brought out. Well, look, what exactly is it that you want out of this Colette-Holtz study? And I'll tell you what it is, Judge. It's page 89. And only on that page 89 what he wants is that he wants to use the statistic to show that Hispanics, he says, were overutilized. But what's wrong about this, Judge Peterson, as you said, isn't this just a recapitulation of what we have? And that's absolutely true because what happens is Judge Holtz in this study decides that nothing should be changed. She says, well, look, yes, I've looked at all of this, but I'm not changing anything for any of the parties, including Hispanics. The third thing that's wrong with Mr. DeShield's position is that what he really wants to do is cherry pick in this case. I would just address, point out to you page 31 of his brief, of which he says, well, look, I want the whole study in. But then why don't you just go two pages further? On page 33, in footnote 13, he says, and by the way, you know, that first part that the court did see and that everybody knew about, which was Ms. Holtz' analysis, the economy-wide analysis of which she found disparities, he says, but no, no, no, I don't want that part. And the reason he says in footnote 13 that he doesn't want that part is because he says Ms. Holtz doesn't know anything about statistics, and that your honors ought to exclude that part but take the part, that page 89 that I want you to take. Well, you can't have it both ways. And he's got two different things in his brief, and he really, in this particular case, ought not to have neither. And, Judge, I think it's because one of the things that you pointed out to me is, well, anyway, isn't there some avenue of flexibility allowed? Shouldn't they have some opportunity to digest this material? Well, the truth of the matter is that the board hasn't even had an opportunity to act on this piece of information. Nowhere is it that, you know, are things right with respect to this, and therefore with just that in mind, that's another reason that we don't believe that this report should be accepted. Let me just follow up on that. Yes, Your Honor. I mean, I think obviously the general rule is that you don't get to bring in the evidence this late in the game. But let's assume that they get over that pretty substantial hurdle, and we consider that. But doesn't the actual evidence of the utilization of Hispanic contractors and Asian contractors suggest some deficiency in the way that the program is narrowly tailored to the discrimination that actually exists in the road construction industry? No, I don't think it does, Judge. And I think that what the – and see, this is the problem. I can only anticipate what Ms. Holt is going to say, but having dealt with Ms. Holt for a number of years, what she's going to say is that I looked at the whole thing. I looked at the anecdotal evidence. I looked at the other statistics. And what I'm going to make a determination is, no, it doesn't show an overutilization. It shows that this remediated market program is working. And it's a lot like what Dr. Blanchflower says that when a patient comes in who's on heart medication for high blood pressure and says, well, doc, you know my blood pressure is down. Can I stop taking the medicine? And the doctor looks at him and says, no, you can't stop taking the medicine because what we're doing is working. And I do believe that that is what Ms. Holt would say with this remediated market. Let me voice my concern with it. It seems to me that one inference that you could draw from this data is that the program is working for Asian Americans and Hispanic Americans, but that the minority groups that need it the most, African Americans and women, to a less pronounced but still significant degree, are actually now not going to be the beneficiaries of it so much because the prime contractors are satisfying their DBE goals with Hispanics and Asians. So African Americans and women aren't going to get much bang out of this program. Well, I think that we have to go back to, as Judge Hamilton says, this information that we receive is constantly changing. And one of the things that I think that the board with the tollway and everybody who receives constantly changing information is we have to make some adjustments. And it's not to say we just haven't been given an opportunity to make those adjustments, and I think that we'll probably take every opportunity to see what Ms. Hamilton has to say to make the appropriate adjustments. So the idea is give the Department of Transportation and the tollway the chance to respond to that and maybe there will be adjustments. Absolutely, Your Honor. Mr. Jones, could you address the zero goal experiment that the tollway tried? Well, Judge, this is a lot like the medication thing. And I'm glad you bring this up because what Dr. Rainway from New England, what everybody will say, when we do a zero goal, what we find out is that minorities are not used with the same degree that they would be used during the course of the program. And I think the participation dropped off a cliff, didn't it? Absolutely off the cliff. And what it shows us that we have to, in all the anecdotal evidence you will see, you will see every one of the minorities say that without this program we would not have worked. If there's no more, if there's nothing else, I probably ought to give the remainder of any time I have until I clean up here. I'd actually like to follow up on a few tollway-specific questions, Mr. Jones. One issue that's been raised has to do with the reliability of the tollway's utilization numbers where we've got some different figures over the early 2000s, 11.4%, 0.1%, 1.5%, 1.7%. And the plaintiff has argued your numbers just aren't reliable and at least ought to present a genuine issue for trial. All right. I know exactly what you're talking about, Judge. Well, let me tell you this. The first set of numbers that go way back to 2002 were the numbers in the first northern contracting case. And in those days we were not a party at that time. And using the best figures that we had available at the time, because we weren't doing the kind of statistics that certainly we do once we got started with the NERA program, we gave the best available figures we had, which was the 1.5 and the 1.7. When we came along with the NERA figures, we showed that the participation rate was 11.4. And what it really shows is, no, there's no huge discrepancy. Both figures show a discrepancy. And quite frankly, the – Both show significant underutilization. Exactly. Okay. But there's still, in terms of reliability, there's a big difference between them. If you're telling us that the NERA study is more reliable, I get that. Yeah. And, Judge, we have to admit that with the first figures we got, it was at a time when we were not parties to the case and we were scrambling to find the best available figures at that time. Okay. And then, could you tell us what the record indicates the tollway is doing to monitor for and prevent overconcentration? Yes, I'm glad you asked that, Judge, because Mr. DeShield was absolutely wrong on this when Mr. DeShield said that – and the way he would monitor for overconcentration would be to have both subcontract dollars of DBEs and non-DBEs, but as you will find in our statement of the fact, he misses the point. He says, well, we didn't have it. Our statement of fact shows that from 2000 to 2005, we did keep total subcontract dollars. So if you wanted to look for overconcentration, you would have found it. And the new Collette-Holtz study does it even one step further, where we had the total dollars in the 2006 Neuro study. The Collette study even subdivides it by groups and makes it even easier for you, and we've always tried to keep those numbers to worry about overconcentration, but quite frankly, none of the studies or anybody that, including Mr. DeShield or anybody, has ever given us anything to say that, look, your program has overconcentration. Thank you. One more toll-weight particular question. I'm a little bit unclear about the way the individual contract goals are set. I understand we have the overall goal of, I think it's generally been 22.77% DBE participation, but then on sort of the line-by-line parsing to get to the goal, if you could just give me a thumbnail sketch on how those numbers are done. The way that works, Your Honor, is because, you know, all these things are nowadays with the Neuro studies divided into what they call next codes, and those next codes have what kind of work. You can get a greater weighted availability if it's the kind of work that's done by the particular agency. So what's done, when you go to the table for that and you look at it, it has NERA's availability numbers so that in the shorthand sort of this, when you're looking at it, you're seeing what your total dollars are in this particular area. There are next codes for that. You're seeing what kind of line of work. There are next codes for that. So all you have to do is match this up with the availability that's done by you with the statistics of NERA, which are unavailable, and then that's how you come up with the goals. So you look at a line, you look at the study that says there's DBE availability of 33% in that line item, that's the DBE goal for that line item, and you add them up at the end. That's correct, Your Honor. Thank you. What are the codes you were referring to?  You'll see them in the brief. Don't ask me. It's N-I-C-S. Okay. But that's all through the brief. North American Industrial Classification System. The successor to the S-I-T code. Okay. Thank you, Your Honor. Thank you. Thank you. Thank you, Mr. Jones. And then Mr. Huzag for the Department of Transportation. Huzag. Huzag. Huzag, sorry. Good morning, Your Honors. Richard Huzag, counsel for IDOT. I'm usually the one who gets to correct the pronunciation of my name. I do it often. That formality has been taken care of. That's all right.  Where was your daddy? Who was a lawyer? And I mean that as a compliment. So I urge the courts to affirm the district court's entry of judgment in IDOT's favor, and we adopt the federal government's arguments with respect to the facial challenge to the program here. And we also don't see any non-forfeited argument that the court should overrule northern contracting, which this court recently reaffirmed in the Dunnett Bay decision. Their opening brief does not say that it should be overruled. It simply says that the case is distinguishable because in that case, there was summary judgment entered against the federal government in the district court, and that was not appealed. A fair reading of the northern contracting case shows that that is not the essence of the opinion. The essence of the opinion is that to the extent that the federal government prescribes regulations that govern the implementation of this type of program with federally subsidized road construction funds, then the state is deemed to have narrowly tailored its program on an as-applied basis, provided that it does not exceed its federal authority, either by violating some mandate of the federal regulations or failing to do something they're required to do or doing something they're prohibited from doing. There was no argument in this case that IDOT has done either of those things. In essence, it has complied with the federal regulations. It has not exceeded its authority. If the court felt inclined to reach out and reconsider northern contracting, we would nonetheless insist that the program that is federally subsidized, for the same reasons that apply to the solely state-funded aspect of the program, which is about 15% of the total spending for IDOT, satisfies the strict scrutiny standard as articulated by the United States Supreme Court and is refined by subsequent case law in this and other circuits. Strict scrutiny is strict scrutiny. We don't suggest that anybody deserves an easy pass when you are incorporating race-conscious measures into a program of this variety. But I want to emphasize that this program is something that is built upon a longstanding understanding of the road construction industry throughout the country and in Illinois. And the Supreme Court has made it clear that government has a compelling interest in redressing and responding to such discrimination, not just by itself in its own contracting decisions, which would here be the letting of prime contracts, but also when it's putting money into an industry where there's discrimination going on in the private sector. And it has a compelling interest in dealing with that discrimination one step removed. So here the test is not did IDOT convincingly and dispositively prove that there was actual discrimination, although we think the evidence probably would meet that test, but instead whether there is a strong basis in evidence to conclude that there was such discrimination and the continuing effects of that discrimination are affecting the road construction industry. Let me ask you a question about this. One of the things that happened here is that the issue was decided on summary judgment, even though the district court acknowledged that Dr. Gurian's testimony to some degree undermined the government's evidence of the underutilization. And so is it appropriate to do it on summary judgment? Shouldn't it have gone to trial? It sounds like a dispute of fact. We think that in this case for the reasons that are the facts and circumstances that are presented, it was appropriate for the district court to enter summary judgment. And it has multiple aspects that inform that conclusion. First, the ultimate legal question of an equal protection violation is largely reviewed de novo. To the extent that there are genuine issues of fact and they are material, then of course you have to take those in the light most favorable to the plaintiff in this case because of the summary judgment. But the standard review is sort of like a First Amendment case. It's sort of independent review because you have an ultimate constitutional question, the application of the legal standards to the facts presented. Then the court of review engages in a slightly more searching review as to the ultimate findings of strong basis in evidence and narrow tailoring. And so the question is not did the district court or could it have properly found that there was actual discrimination to support compelling interest, but rather was there sufficient evidence so that this court can conclude as a matter of law that the strong basis in evidence test has been met. And we suggest that the record does show that. In addition, discovery was closed on liability issues. There was a deadline to file cross motions for summary judgment. Both sides did. All their cards are up on the table now. So this court can evaluate, looking at all of that evidence, whether it believes there is a genuine issue of material fact with respect to the strong basis. That's a fair point, but as a day job as a district judge, which I'm very aware of instructions from the Seventh Circuit that even on cross motions for summary judgment, you don't decide the facts. That is certainly true. And at some point there is a line drawn where the evidence presented enables you as a district court judge or the Seventh Circuit on review one of the appropriate standards to say that it can conclude as a matter of law that any genuine disputes regarding historical fact do not rise to the level of a genuine issue of material fact in light of the constitutional standard which presents a question of law. We also suggest that there is plenty of other evidence besides just the underutilization evidence to support the strong basis in evidence finding here. There are, as Judge Hamilton indicated, the zero goal studies not done just by the Tollway but also done by IDOT that were extraordinarily revealing in terms of what happens when there is nothing done to try and deal with the long and pervasive history of invidious discrimination in this industry. On top of that, there is anecdotal evidence. We do not rely upon that alone to support the strong basis in evidence finding. There is the original NERA study that shows the disparity between the availability of available DBEs, minorities and women firms and their utilization. That evidence was reaffirmed by updated evidence in the Mason-Tillman study in 2011. That study, in addition, conducted a regression analysis to try and isolate specifically the factors that correspond to the lower business formation, business earnings and access to lending that is suffered by minority and women-owned firms and concluded that in all probability discrimination was the reason for those specific disparities. So there is a wealth of evidence to support. Let me ask you about on the subject of the regression studies. I don't understand Midwest's sense to really be challenging the statistics, the regression analyses. But what they are challenging is the assumptions that go into the regression analyses. And one of those critical assumptions I gather is that the reason size or capacity of contractors is not considered as a nondiscriminatory reason is that size is itself the product of discrimination. And I wonder whether the government is obligated to have some evidence for that assumption. Correct me if I'm wrong about that being the reason for why capacity was not considered to be a nondiscriminatory reason. I don't think the government is required to have evidence of the validity of that assumption. The court would not be writing on a blank slate. Other courts have said that when you conduct this type of analysis, if you can conclude that discrimination with respect to the regression analyses done by the MTA study that I identified is the probable reason for them, then the case law says it is incumbent upon somebody challenging those studies to do more than provide conjecture or surmise as to some other reason that could account for it. I do want to emphasize, however, that the strong basis in evidence test is not supported solely by the regression analysis aspect of that study or the disparity, which is concluded to be statistically significant in terms of availability compared to utilization. And, of course, it is reinforced by the zero-goal experiment and zero-goal contracts as well as the anecdotal evidence. I want to make sure that I would have liked to address not the standing issue. The court can read Dunn at Bay as well as I can and make up its own mind as to the rationale of that case and Northern Contracting likewise. I see my time is up. Mr. Husserl, we have a lot of material that we've covered here, and I'll give Mr. DeShiel a little extra time as well, but I'd like to have you address as directly as you can the plaintiff's argument about, in essence, because of the differences and gaps between prime and subcontractors, that the burden of meeting the entire industry standard winds up falling on the smaller non-minority or disadvantaged subcontractors. Yes, and I think I would largely adopt Mr. Koch's explanation. The mismatch concept is, in fact, sort of pointing a finger at a disconnect that doesn't really exist. The overall goal is set as a percentage of total contracting dollars because that's realistically the only way you can do it. You can't measure it as a percentage of subcontracting dollars. That isn't determined until after a contract has been led and the prime contractor chooses how much it's going to use subcontractors for. So, as a methodological matter, that's the only way it can be done. And realistically, though, when it comes to the implementation for the race-conscious measures, after all race-neutral measures have been applied, realistically, the way that that's implemented does not impose an undue burden on non-DBE subcontractors by virtue of just measuring the total as a percentage of total contract dollars because the individual goals themselves are based upon the availability, both in terms of work expertise and area and other work that's being performed by DBE subcontractors that can do those line items of work that are within the total prime contract. The engineer for the region does an estimate of all the values of all the different types of work that are going to be done and then determines based upon local conditions whether any of those line items can be performed by DBEs that are available to do so. And if so, then that goes into the individual contract goal again after the race-neutral measures are applied. If I understand the difference between the way IDOT calculates the project goal and the way the Tollway does it, so the Tollway looks at the availability of DBEs in each line item, but IDOT doesn't. IDOT does look at the availability of DBEs in each line item. What's the difference between the way IDOT does it and the way the Tollway does it? I wish I could answer that, but I have not focused on the way that IDOT calculates their individual contract goals, and if there are differences there, I wish I could elaborate on them. But my brief provides, I believe, a very precise and accurate description of the manner in which IDOT calculates its individual contract goals, again subject to the flexibility items that I want to remind the Court of, which is that those goals can be met through other types of items. There is a front-end goal modification process that is used on fair occasion, and most of the requests for such front-end modifications are granted. The case law has emphasized the importance of those types of things. The plaintiff has tried to characterize this program repeatedly as being a de facto quota or set-aside, and nothing could be farther from the truth. There is a great deal of attention to making sure that that is exactly what the program does not become, and I want to emphasize again sort of the overall picture, which is that narrow tailoring is not perfect tailoring. The plaintiff would like IDOT to gather an exhaustive, encyclopedic, complete set of data as to all available information, as to all subcontracting bidders, DBE and non-DBE alike, and put that up on the Internet for everybody to see so that he can do the type of spreadsheet analysis he'd like to present to the Court for those purposes. And the answer is, first, that's not information that IDOT has now. It would have to insist that prime contractors gather that information. We're talking about tens of thousands of subcontract bids for the contract that it lets each year. But then subcontractors don't always bid exactly on the same work. Sometimes they'll submit a single bid for three items of work, whereas another sub will provide a subcontractor bid for two items of work. So we're talking about a tedious and exhaustive process of trying to render an apples-to-apples comparison and then put that on the Internet, where all these subcontractors are basically going to say, my confidential commercial proprietary information is going to be available for examination by my competitors. We have a system that is narrowly tailored. And the problem with the plaintiff's position is they haven't suggested something that actually is more workable and would accommodate the constitutional goals here any better than what's being done now. They just don't like what's happening. And we are sympathetic to the fact that any program like this does result in some burden on innocent non-minorities and white men contractors. That is an aspect of this program that is not to be celebrated, but it is part of what the Constitution permits and requires when you have a situation in which there is a longstanding history of invidious discrimination. And I would suggest that the evidence shows that the burden upon subcontractors in the guardrail and fencing field is not such as to demonstrate overconcentration. In the year that they point to, the supposed lost contract revenues, which keeps on going down as we go through discovery and kind of kick the tires and vet the analysis there, is about 4% of their total revenues for that year. In 2007, they had more than $17 million in revenues. They had more prime contract revenues than all of the other DBEs in their field, and they were higher in subcontracting in that field than all but one of the DBEs. IDOT reasonably concluded that there was not overconcentration. If the court disagrees, however, the regulations provide a mechanism for IDOT to seek a waiver of that approach so that it could seek approval for other means. Unless the court has any other questions, I appreciate your indulgence in my going over my allotted time. Thank you, counsel. And I urge the court to affirm. How much time does Mr. DeShiel have by your? Okay. Take 10. I'll limit myself to the rebuttal. Some bullet items. A couple of major points came up. Your Honor mentioned the zero-goals contracts and what sort of participation was obtained. There are two serious problems of looking at the zero-goal contracts as probative evidence. The first, and it's been admitted by the defendants, including IDOT certainly, that many of these contracts simply have no subcontractable items. And if they have no subcontractable items, they aren't going to be subcontracting anything out, which means there will be no DB participation. So the first thing this court has to know is on these zero-goal contracts, why was it not zero-goal? It may be because there were little or literally none, zero subcontractable items. So that tells us nothing. Also, the law in this circuit, which was overlooked actually by the district court in Northern Contracting, we have Builders Association of Greater Chicago versus County of Cook. Cited in the briefs. I don't have the actual citation in front of me. Justice Posner's opinion explained. In that case, the defendants tried to say that there was evidence of discrimination because they compared participation in Cook County where they had the DBE program with the private industry where they did not have such a program. And the court pointed out that that doesn't mean anything because the existence of the program itself encouraged, the Arab League of Women Minority Contractors, to bid on those contracts where the preferences were given. And they could even have a price advantage. And the non-DBEs or non-minority males competing with them in turn were driven into the private sector. And as this court noted in that case, the disparity you saw between the public and private sector, private sector being the un-remediated competing sector, was an artifact of the county's own ordinance. The exact same principle applies here. It's a basic principle of economics. So those are two reasons. One, you need to know why there are zero goals before any inference can possibly be drawn. No evidence from defendants on that. Secondly, the law in the circuit is, it's not valid grounds to make an inference of discrimination. With respect to the setting of contract goals, the tollway and IDOT are a little bit different. I'd like to talk about the tollways for a moment. They point out that they take these percentages of availability as found by the nearest study and apply that to the given line items in the contract, multiply that together to find out, well, this is what the anticipated participation we should have on this line item of work from these minorities. Which sounds good. Two big problems with that. The first, the tollway claims, oh, we account for the fact that the general contractor in tollway contracts has to self-perform 35% of the work. The uncontested testimony is prime contracts generally perform more than half of the work. More than half of the work. Now, no DBE or non-DBE subcontractor is able to get that work that the general contractor is self-performing. What the tollway needs to do with that system is account for what the general contractor will self-perform, which they require 35% no matter what. And you would be slashing all their goals by half just by that consideration. They claim they consider it. You heard Mr. Jones explain how they do it. You can read the testimony explaining how they do it. They, in fact, do not account for self-performance. That would cut the goals in half. The result is the general contractor, prime contractor, then has to find somewhere else to make up. He has to get it out of the non-DBE subcontractor's share. So it tends to concentrate. Your argument is that it tends to concentrate the DBE goal into the non-self-performed parts of the prime contractor's share. Correct, correct. So you really have goals that are roughly or actually more than twice as high as they should be typically. Now, you have a similar problem with IDOT. IDOT does it a little bit differently. Their idea of looking at actual availability, using their words, they compare actual availability of individual contract goals with the overall goals set by the SPIRI studies. First thing the court's going to notice. In reality, if we look at how the program works in practice, as we must now do under Fisher, the way that goals are actually set by nine different districts, who knows what kind of centralized utilization process we have that you can strictly scrutinize doing that in the first place. What they really have are guidelines to maximize DBE participation because they look for all subcontractable items for which they have DBEs available in a given district, and those are considered to be done by DBEs in the way they set their goals. And the only thing that makes it even workable at all is that IDOT admits for reasons known only on high, does not, trucking and supply are not listed typically as line items on contracts, but IDOT does give credit to the general contractors when they use a DBE trucking company or a DBE supplier. It's a limited credit on the supplier. And then they say, if we did not do this, Midwest-West would never get a job. That's in IDOT's brief. Now, what that tells you is, in fact, what they're doing is having guidelines that set goals to maximize DBE participation. They never reach the overall goals because of the very reasons we stated earlier, the disparity studies, which aren't followed anyway, overestimate DBE availability. And they do that because they're pretending that DBEs are available to perform work they cannot perform and do not perform in practice. So you're really disputing IDOT's contention that they're using DBE availability, the proportion of DBE availability in their individual contract goals. Yeah, I didn't initially hear them say that portion of it. The court said it a little better than they did. Well, because your description is that IDOT goes down line by line, and if there are two or more DBE entities available to perform that line, that whole line goes into the contract goal as part of the objective. Right, correct. And so imagine there are 10 line items. If seven of those line items have two or more DBEs available, then 70% is going to be that contract goal. Well, 70% in terms of the number of the contracts. What we're really interested in is what is the actual money that's going to be going to people? Oh, so they would do it on the number of contracts. They're not doing it on budget. They're doing it on the number of contracts available. They're doing it on the budget, Sharon. They're setting their DBE participation goals as a matter of dollars that have to go to DBEs. When they say a DBE goal, 20% is 20% of the total. Dollars, not just 20% of the line items. But it's based on line by line looking at whether there's multiple DBEs available in that contract line. Yes. Your Honor's description was accurate about how that is actually done by IDOT. Anything further? Sure. I see that my time is up, which I'm assuming takes an extra three minutes, and I want to thank the court for allowing me the extra time. I could go on forever, as the court concedes there's no extra time. I'm afraid of this. Many of us are at risk of that. So, okay. I want to thank the court for allowing me the extra time. Thanks to all counsel for the very helpful presentations in this case. The case will be taken under advisory.